# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**KENOSHA UNIFIED SCHOOL DISTRICT,**
**KIMBERLY AREA SCHOOL DISTRICT,**
**SCHOOL DISTRICT OF WAUKESHA,**
**WEST-ALLIS-WEST MILWAUKEE SCHOOL DISTRICT,**
**WHITEFISH BAY SCHOOL DISTRICT,**
**JOSEPH MANGI, GARY M. KVASNICA,**
**JASON P. DEMERATH, KURT WACHHOLZ and**
**SHAWN M. YDE,**

         Plaintiffs,

                                            **Case No. 08-C-931**
                                                 **08-C-932**

        -vs-

**STIFEL NICOLOUS & COMPANY INC.,**
**STIFEL FINANCIAL CORPORATION,**
**JAMES M. ZEMLYAK, ROYAL BANK**
**OF CANADA EUROPE, LTD., RBC**
**CAPITAL MARKETS CORPORATION, and**
**RBC CAPITAL MARKETS HOLDINGS (USA), INC.,**

         Defendants.

---

## DECISION AND ORDER

---

Plaintiffs, a group of local school districts and school officials, sued the defendants, a group of investment banking firms as well as the CFO of one of those firms – James Zemlyak. Plaintiffs seek to recover losses allegedly caused by their investment of "$200 million into three Synthetic CDOs created and marketed by the defendants as a safe and secure method of funding plaintiffs' ever-increasing 'Other Post-Employment Benefits' liabilities, without increasing the burden on school taxpayers." D. 1-3, Complaint ¶ 25.

Plaintiffs allege that defendants' investment scheme caused them losses in excess of $150 million.

This action was originally filed in Milwaukee County Circuit Court. Two groups of defendants filed separate notices of removal. Defendants removed on the basis of diversity jurisdiction, 28 U.S.C. § 1332; the exclusive jurisdiction provision of the Securities Exchange Act, 15 U.S.C. § 78aa; and federal question jurisdiction, 28 U.S.C. § 1331. Once removed, the Court consolidated both actions into one case.

Now before the Court is plaintiffs' timely motion for remand. Plaintiffs argue that the parties lack complete diversity because one of the defendants (James Zemlyak) is a citizen of Wisconsin. Plaintiffs also argue that none of the claims in their complaint present a federal question.

In opposition, defendants argue that the parties are completely diverse because Mr. Zemlyak is a citizen of Missouri. Defendants also argue that one of plaintiffs' claims – a breach of contract, third party beneficiary claim – arises under the exclusive jurisdiction of the Exchange Act. Finally, defendants argue that this claim presents a federal question because it references and relies upon certain regulations enacted pursuant to the Exchange Act by the Financial Industry Regulatory Authority (FINRA).

For the reasons that follow, the Court finds that Zemlyak is a citizen of Wisconsin for jurisdictional purposes. The Court also finds that plaintiffs' third party beneficiary claim does not arise under the exclusive jurisdiction of the Exchange Act and it does not present a substantial federal question. Therefore, plaintiffs' motion for remand is granted.

# BACKGROUND

Plaintiffs Kenosha Unified School District, Kimberly Area School District, School District of Waukesha, West Allis-West Milwaukee School District, and Whitefish Bay School District (collectively the School Districts) are the statutorily-authorized, publicly-funded territorial units for school administration for their respective municipalities located in and around Milwaukee County, Wisconsin.

Plaintiffs Joseph T. Mangi, Gary Kvasnica, Jason Demerath, and Kurt Wachholz are all natural persons and Trustees for the various School Districts involved in this lawsuit. All of these individuals are residents of Wisconsin, and all the Trusts for the various School Districts are validly formed and existing under the laws of the State of Wisconsin.

Defendants Stifel Financial Corp. ("Stifel Financial") and Stifel, Nicolaus & Co., Inc. ("Stifel") are foreign corporations incorporated in Missouri with their principal places of business in St. Louis, Missouri. Defendant Royal Bank of Canada Europe, Ltd. ("RBC Europe") is a foreign corporation with its primary place of business in London, United Kingdom. Defendant RBC Capital Markets Corporation ("RBC Capital") is a Minnesota corporation with its principal place of business in New York, NY. Defendant RBC Markets Holdings (USA) Inc. ("RBC Holdings") is a Delaware corporation with its principal place of business in Minneapolis, Minnesota.

The remaining defendant is Mr. Zemlyak. Zemlyak worked for Robert W. Baird & Co. from April 1990 until February 1999. During this time, he rented an apartment in Milwaukee. In February 1999, Zemlyak became the Chief Financial Officer for Stifel

Nicolaus in St. Louis. As a "C level" executive of Stifel Financial and Stifel Nicolaus, Mr. Zemlyak performs his numerous duties associated with those jobs from Stifel's headquarters in St. Louis, Missouri. It is impractical for him to do his job from any location other than Stifel's St. Louis headquarters. Stifel maintains 14 offices in Wisconsin, but Zemlyak has never maintained an office in Wisconsin, nor accomplished any appreciable work from any of Stifel's Wisconsin offices.

Zemlyak rented an apartment in St. Louis and lived there until June 2002. In May 2002 he purchased a single-family house in Missouri (the "Laclede Avenue Property"). This house is approximately 2,000 square feet and contains three bedrooms and two-and-one-half baths. Zemlyak purchased the Laclede Avenue Property for $359,101. Zemlyak's future wife (they were dating at the time) Eleni Sommerfeld helped him pick out the Laclede Avenue Property. It was purchased with the expectation that it would be their family home.

In August 2003, Jim and Eleni were married in St. Louis, Missouri. The State of Missouri issued the Zemlyaks' marriage license and the service was performed pursuant to the laws of Missouri.

The Zemlyaks met in the 1990's while Zemlyak worked for Robert W. Baird. At the time of their wedding, Eleni lived in New Berlin, Wisconsin with her two children from a previous marriage. Pursuant to a judgment of divorce, Mrs. Zemlyak has "joint legal custody" of those two children with her ex-husband. The divorce judgment requires that the children spend "fairly equal" time with both parents. The judgment also provides that for Mrs. Zemlyak to move from Wisconsin with her two children, she would likely need the

-4-

consent of her ex-husband and/or the approval of the Court, based on the "best interest of the children."

Before their marriage, Mr. Zemlyak planned to establish his family's roots at the Laclede Avenue Property in St. Louis. However, Mrs. Zemlyak became ill approximately one month before the couple was married. Thereafter, she began extensive specialized treatment at the University Hospital in Madison, Wisconsin – an institution specifically recognized for its expertise in treating Mrs. Zemlyak's type of illness. Because of the intervening medical situation, as well as the limitations on her ability to move with the two children from her prior marriage, Mrs. Zemlyak chose to remain in Wisconsin and continue treatment for her illness.

In 2003, Mr. Zemlyak acquired Eleni's New Berlin residence.[1] He visited there whenever work allowed, which was initially three out of every four weekends. In 2004, Zemlyak and his wife bought an additional Wisconsin property, located on Hawthorne Drive in Elm Grove (the "Hawthorne Drive Property"). The purchase price was $307,500. Shortly after acquiring the property, the Zemlyaks demolished the single-family home on the Hawthorne Drive Property. The Zemlyaks contracted with Regency Builders, Inc. to construct a new home on the site. The initial amount of the contract was $1,059,880. The Zemlyaks financed the new construction with a mortgage loan through Great Midwest Bank. Zemlyak indicated on the loan application that the Hawthorne Drive Property would be his "primary residence." Construction on the Hawthorne Drive Property was completed in 2006.

---

[1] He did so in exchange for a condominium located in New Berlin, Wisconsin that Zemlyak purchased in 2000 for investment purposes. Zemlyak never lived in the New Berlin condo.

In the same year, the Zemlyaks sold their New Berlin residence. Zemlyak updated his Wisconsin driver's license to list Hawthorne Drive as his current address. The Hawthorne Drive Property was re-assessed in 2009 and valued at $1,827,000. The dwelling at Hawthorne Drive spans 8,476 square feet and contains five bedrooms and 5.5 baths. Zemlyak pays 100% of the mortgage and property taxes on the Hawthorne Drive Property.

Zemlyak owns or co-owns with his wife four vehicles, all of which are registered and titled in Wisconsin. Of these four, two of the vehicle titles were issued in 2004, the year after Jim and Eleni were wed, including the one car Zemlyak owns independently. The other two vehicles were registered in 2007 and 2008.

In 2006, Jim and Eleni Zemlyak had a child of their own – John Zemlyak – who was born in Waukesha, Wisconsin. John Zemlyak lives (and has always lived) with his mother and two step-brothers at the Hawthorne Drive home. Since his son's birth, Zemlyak increased the frequency of his trips back to Wisconsin from 75% of weekends to 90%. Unless they are traveling on vacation, the Zemlyak family spends every holiday in Wisconsin, celebrates the children's birthdays there, and has rarely visited Missouri together over the past two years.

Mr. Zemlyak and his family worship in Elm Grove and the children attend school there. Zemlyak is also a member of the Western Racquet Club in Brookfield, Wisconsin. When applying for a membership at the club in 2006, Zemlyak listed the Hawthorne Drive Property as his "Home Address" and the Laclede Avenue Property in Missouri as his "Other Address." In 2008, Zemlyak changed his club membership status from "Social Swim" to

-6-

"Class A." Zemlyak never sought Non-Resident status, which is less expensive and enjoys the same privileges as Class A membership.

Mr. Zemlyak registered to vote in St. Louis beginning with the 2000 election. Since 1999, Zemlyak pays taxes as a resident of Missouri and the City of St. Louis. Zemlyak's tax filings in Wisconsin are as a non-resident. The sole address of Zemlyak's FINRA license is that of Stifel's office in St. Louis. Zemlyak's primary banking relationship is in St. Louis with Stifel Bank & Trust. Zemlyak's doctors, dentist and attorney are located in St. Louis. Zemlyak's life insurance policy is located in St. Louis. Zemlyak's birth certificate is located in St. Louis. Zemlyak receives his personal mail, including paychecks and personal bills, in St. Louis. Zemlyak and his wife joined the Basilica in St. Louis after marrying in 2003. Zemlyak is a member of the Missouri Athletic Club in St. Louis, where he incurs approximately $700 per month in charges, in addition to $300 in monthly dues. His use of the Western Racquet Club in Brookfield is infrequent, and the membership is primarily for the benefit of his children. Approximately one-half of the Zemlyak's family photos and other mementos are located in St. Louis.

For his part, Mr. Zemlyak intends that his family will ultimately join him in St. Louis, where he lives and works. He states that he has no intention to leave St. Louis.

## ANALYSIS

### I. Removal

The burden of establishing jurisdiction in a removal case rests on the party seeking removal. *See Tylka v. Gerber Products Co.*, 211 F.3d 445, 448 (7th Cir. 2000). A defendant

seeking removal may meet its burden by a preponderance of the evidence. *See Shaw v. Dow Brands, Inc.*, 994 F.2d 364, 366 (7th Cir. 1993). "If [a defendant's] allegations of jurisdictional facts are challenged by [its] adversary in any appropriate manner, [the defendant] must support them by competent proof. . . . [F]or that purpose the court may demand that the party alleging jurisdiction justify [its] allegations by a preponderance of evidence." *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *see also Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 543 (7th Cir. 2006) (party seeking removal must establish jurisdictional facts by a preponderance of the evidence); *LaSusa v. Lake Mich. Trans-Lake Shortcut, Inc.*, 113 F. Supp. 2d 1306, 1308-09 (E.D. Wis. 2000) (defendants must support their jurisdictional allegations with 'competent proof,' meaning 'evidence which proves to a reasonable probability that jurisdiction exists'") (internal citations omitted).

Courts interpret the removal statutes narrowly with the implicit understanding that a plaintiff is free to choose his forum. *See Doe v. Allied-Signal, Inc.*, 985 F.2d 908, 911 (7th Cir. 1993). The Court must resolve any doubts regarding subject matter jurisdiction in favor of remand. *Id*. "[T]he removal of civil cases to federal court is a serious infringement upon state sovereignty and should not be allowed without '[d]ue regard for the rightful independence of state governments . . .'" *Prod. Stamping Corp. v. Maryland Cas. Co.*, 829 F. Supp. 1074, 1075 (E.D. Wis. 1993). The Court may retain jurisdiction "only where its authority to do so is clear. Any other holding would detract from principles of federalism, comity, and the sovereignty of the several states." *Id.*

-8-

## II.      Diversity of citizenship

Federal courts "shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states." § 1332(a)(1).  For the Court to exercise jurisdiction under the diversity statute, there must be "complete diversity between all the plaintiffs and all the defendants."  *Kauth v. Hartford Ins. Co. of Ill.*, 852 F.2d 951, 958 (7th Cir. 1988) (citing *Strawbridge v. Curtiss*, 7 U.S. 267 (1806)).

"'Citizenship' for purposes of § 1332 means domicile rather than residence." *Denlinger v. Brennan*, 87 F.3d 214, 216 (7th Cir. 1996).  Establishing domicile requires "physical presence in a state, with intent to remain there."  *Id.*; *see also Perry v. Pogemiller*, 16 F.3d 138, 140 (7th Cir. 1993) (domicile is physical presence coupled with "intention to maintain the residency indefinitely").  The "domicile of an individual is his true, fixed and permanent home and place of habitation.  It is the place to which, whenever he is absent, he has the intention of returning."  *Vlandis v. Kline*, 412 U.S. 441, 454 (1973).  Although one can concurrently maintain more than one residence, a party may have only one domicile at any time.  *See Williamson v. Osenton*, 232 U.S. 619, 625 (1914).  Jurisdiction depends upon citizenship at the time a case is filed.  *Id.* at 624.

For diversity purposes, domicile is "a state of mind which must be evaluated through the circumstantial evidence of a person's manifested conduct."  *Sadat v. Mertes*, 615 F.2d 1176, 1181 (7th Cir. 1980).  "[S]tatements of intent are entitled to little weight when in conflict with the facts."  *Id.*  Courts rely on a variety of factors, including current residence,

location of belongings and personal property, voter registration, driver's license and vehicle registrations, place of employment, presence of family members, and extent of social involvement in the surrounding community. *Id.* at 1181, n.5. A party's "entire course of conduct may be taken into account. It is not enough to simply establish physical presence, but in order to turn residence in fact into a domicile in law the party must show, by some objective act, his intention to maintain the residency indefinitely." *Perry*, 16 F.3d at 140.

Courts entertain a presumption in favor of an individual's old, established domicile. *See Texas v. Florida*, 306 U.S. 398, 427 (1939); *Lew v. Moss*, 797 F.2d 747, 751 (9th Cir. 1986). A change in domicile requires "(a) physical presence at the new location with (b) an intention to remain there indefinitely." *Moss*, 797 F.2d at 750; *see also United States v. City of Highwood*, 712 F. Supp. 138, 142-43 (N.D. Ill. 1989). When, as here, the party claiming a new domicile is the opponent of federal jurisdiction, that party "bears the initial burden of producing sufficient evidence to rebut the presumption in favor of the established domicile. If the party does so, the presumption disappears, the case goes forward, and the party asserting jurisdiction bears the burden of proving diversity of citizenship." *McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 288 (3d Cir. 2006); *see also* 15 MOORE'S FED. PRACTICE 3D § 102.35[6] ("The presumption in favor of an established domicile over a newly acquired one has the effect of shifting the burden of production of evidence. The party asserting federal jurisdiction continues to have the burden of persuasion regarding the existence of federal jurisdiction and therefore the existence of diversity based on domicile").

The parties agree that Zemlyak was a Missouri resident until some time in 2003. Therefore, the presumption in favor of an old, established domicile takes effect. To overcome this presumption, plaintiffs must produce "enough evidence substantiating a change to withstand a motion for summary judgment or judgment as a matter of law on the issue." *McCann*, 458 F.3d at 288. Zemlyak married a Wisconsin resident and built a multi-million dollar home in Wisconsin for his wife and children to live in. Even though he still works in St. Louis, Zemlyak returns to Wisconsin almost every single weekend to be with his family. This undisputed evidence, along with the other evidence concerning Zemlyak's ties to Wisconsin (vehicle registration, club memberships), is more than enough to create an issue of fact pertaining to whether Zemlyak changed his domicile from Missouri to Wisconsin. Accordingly, the presumption in favor of Zemlyak's previously-established domicile in Missouri falls away, and the defendants bear the burden of persuasion to prove by a preponderance of the evidence that Zemlyak is a Missouri resident.

Considering all of the evidence pertaining to Mr. Zemlyak's domicile, there is evidence pointing towards both Wisconsin and Missouri. While no one factor is determinative, "the residence of a married person's spouse and children (if the couple has not separated) is given considerable weight." *Nat'l Artists Mgmt. Co. v. Weaving*, 769 F. Supp. 1224, 1228 (S.D.N.Y. 1991); RESTATEMENT (SECOND) OF CONFLICT OF LAWS, Ch. 2, Topic 2, Special Note on Evidence for Establishment of a Domicil [sic] of Choice (1971) ("Since a man's home will usually be with his family, the place where his wife and children dwell is likely to be his domicil [sic] . . . [s]o when he leaves his family behind and goes to another

-11-

place, his domicil [sic] presumably remains unchanged"). Balancing all of the remaining factors (*e.g.*, place of work, vehicle registrations, voter registration, driver's license), the Court finds that the presence of Zemlyak's family in a large Wisconsin home establishes his domicile in Wisconsin.

Mr. Zemlyak's stated intention that he wants to bring his family to Missouri is not enough to overcome the fact that his family lives in Wisconsin. Taking Mr. Zemlyak at his word, there is no evidence in the record suggesting that this will ever actually happen in the future, especially in light of his wife's medical condition and the requirement to keep her children in Wisconsin. In any event, Mr. Zemlyak's stated intent is irrelevant for jurisdictional purposes. All that matters is citizenship at the time of the lawsuit. So long as his family resides in Wisconsin, Mr. Zemlyak always has the intention of returning to his home in Wisconsin to be with his family. Mr. Zemlyak works in Missouri, but he works for the benefit of his family and household in Wisconsin. The presence of Zemlyak's family at a primary residence in Wisconsin demonstrates that the "center of gravity" for his life is in Wisconsin. *See Galva Foundry Co. v. Heiden*, 924 F.2d 729, 730 (7th Cir. 1991).

Mr. Zemlyak argues that his vehicle registrations in Wisconsin, his Wisconsin driver's license, his mortgage loan application for the Wisconsin residence, and his racquet club membership in Wisconsin cannot be held against him because domicile or citizenship cannot be proved by estoppel. *See Galva Foundry*, 924 F.2d at 730-31; *Rubin v. Buckman*, 727 F.2d 71, 72 (3d Cir. 1984) ("subject matter jurisdiction can never be created by estoppel"). These arrangements merely corroborate the reality that Zemlyak's family and household are in

-12-

Wisconsin. Therefore, Zemlyak's domicile by estoppel argument is not persuasive. Domicile in Wisconsin is not established by these formalities, but by the presence of his wife and children in a home built to be the Zemlyak's primary residence.[2]

The "main contemporary rationale" for allowing suit under the diversity jurisdiction "is to protect nonresidents from the possible prejudice that they might encounter in local courts." *Galva Foundry*, 924 F.2d at 730. Zemlyak's significant ties to the State of Wisconsin obviate this concern. Zemlyak pays property taxes on a large Wisconsin estate. He is married to a long-term Wisconsin resident. He is a step-parent to two children required to stay in Wisconsin pursuant to a divorce decree. Even though Zemlyak works out of St. Louis, his employer[3] maintains offices in Wisconsin. Under these circumstances, Zemlyak is "unlikely . . . to encounter hostility in [Wisconsin] state courts." *Id.*

This case proves the observation that in the age of "second homes and speedy transportation, picking out a single state to be an individual's domicile can be a difficult, even a rather arbitrary, undertaking." *Galva Foundry* at 730; *see also 24 Hour Fitness USA, Inc. v. Bally Total Fitness Holding Corp.*, No. 08 CV 3853, 2008 WL 4671748 at *4 (N.D. Ill.) (acknowledging the difficulty of "pinning down a financially-advantaged individual's domicile"). The Court is hesitant to assert its jurisdiction because there are multiple factors pointing in different and contradictory directions. "Policing the border of federal jurisdiction

---

[2] As noted, Zemlyak indicated on the mortgage application for the Hawthorne Drive Property that it would be the Zemlyaks' primary residence. It is a federal crime to lie on a mortgage application. *See* 18 U.S.C. § 1014.

[3] The Stifel defendants, Zemlyak's employer, are also unlikely to be prejudiced by litigation in state court because of their substantial presence in Wisconsin.

-13-

is a necessity in any system having both limited (national) and general (state) courts." *Pratt Central Park Ltd. Partnership v. Dames & Moore, Inc.*, 60 F.3d 350, 352 (7th Cir. 1995). "Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits which the statute has defined." *LaSusa*, 113 F. Supp. 2d at 1309 (citing *Nelson v. Keefer*, 451 F.2d 289, 294 (3rd Cir. 1971)).

Accordingly, the appropriate procedure in a removal case is to resolve all doubts in favor of remand and against the exercise of federal jurisdiction. Plaintiffs, after all, are entitled to their choice of forum and are considered masters of their own complaint. The presumption against the exercise of federal jurisdiction is all too necessary when the facts pertaining to domicile are in such apparent conflict.[4] Ultimately, defendants failed to meet their burden of demonstrating by a preponderance of the evidence that Zemlyak's domicile is in Missouri.

## III.   Federal question

An action can be removed if the federal courts have "original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States." 28 U.S.C. § 1441(b). "The presence or absence of federal-question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when

---

[4] Defendants imply that Zemlyak was fraudulently joined to defeat the exercise of federal jurisdiction. Defendants do not come close to proving fraudulent joinder. *See McNichols v. Johnson & Johnson*, 461 F. Supp. 2d 736, 739 (S.D. Ill. 2006) (a "defendant seeking removal based on fraudulent joinder has the 'heavy' burden of proving that, after the court resolves all issues of law and fact in the plaintiff's favor, there is no possibility that the plaintiff can establish a cause of action against a diversity-defeating defendant in a state court").

-14-

a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987). Under the well-pleaded complaint rule, the plaintiff is "the master of the claim" and may thus "avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar*, 482 U.S. at 392.

## A.     Exchange Act

Enacted in 1934, the Exchange Act is one of six federal securities acts. "While the [Exchange] Act provides for direct market oversight by the Securities Exchange Commission (SEC), the day-to-day trading activities of market professionals, like Defendants, are overseen by 'self-regulatory organizations' (SROs) such as the New York Stock Exchange (NYSE) or the National Association of Securities Dealers (NASD)." *Lippitt v. Raymond James Fin. Servs., Inc.*, 340 F.3d 1033, 1038 (9th Cir. 2003). The relevant defendants in this case are registered with the SEC as broker-dealers and are members of FINRA. FINRA was formerly known as NASD.[5]

Section 27 of the Exchange Act provides that "district courts of the United States . . . shall have *exclusive jurisdiction* of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to *enforce any liability or duty created by this chapter or the rules and regulations thereunder . . .*" 15 U.S.C. § 78aa (emphasis added). Accordingly, the Court has "exclusive jurisdiction if Plaintiff's suit was 'brought to enforce any liability or duty' that is 'created by the rules and regulations' of the

---

[5] *See* http://www.finra.org/AboutFINRA/index.htm (In July 2007, FINRA was created "through the consolidation of NASD and the member regulation, enforcement and arbitration of the New York Stock Exchange . . .").

-15-

Exchange Act." *Roskind v. Morgan Stanley Dean Witter & Co.*, 165 F. Supp. 2d 1059, 1065 (N.D. Cal. 2001)

One of plaintiffs' claims is a breach of contract, third party beneficiary claim. Plaintiffs allege that "Stifel and RBC Global have contracted with self-regulatory organizations, including FINRA, to follow the regulations set forth to protect the investing public, including the Plaintiffs, but breached those agreements causing harm to the Plaintiffs, the intended beneficiary of such agreements." Complaint, ¶ 160. Plaintiffs allege that "Stifel and RBC Global violated relevant rules, regulations, and customs of FINRA, including but not limited to: Rule 2110 (Standards of Commercial Honor and Principles of Trade); Rule 2120 (Use of Manipulative, Deceptive or Other Fraudulent Devices); Rule 2310 (Suitability of Recommendations to Customers), including IM-2310-2 (Fair Dealing with Customers); and Rule 3010 (Supervision of Registered Representatives)." Complaint, ¶ 161.

The relevant jurisdictional inquiry is whether plaintiffs' claim was brought to "enforce any liability or duty *created* by" the Exchange Act or the FINRA rules cited in the complaint. *See Lippitt*, 340 F.3d 1042 (citing *Beneficial Nat. Bank v. Anderson*, 439 U.S. 1 (2003); § 78aa). If successful, plaintiffs' claim would not enforce any duty created by the FINRA rules. Instead, it would enforce defendants' contractual duties under state law. Stated another way, the Exchange Act's mechanism to enforce compliance with FINRA rules is a matter solely between FINRA and the defendants as members of the Exchange. By virtue of their contract, FINRA and the defendants also intended to benefit certain third parties – at least, that is what plaintiffs must prove to succeed on their claim. This latter duty was

-16-

created by *contract*, not by the FINRA rules or the Exchange Act. *See, e.g., Lippitt*, 340 F.3d at 1042 ("because Lippitt challenges conduct solely under state law – irrespective of whether it is legal under SRO rules – his claims do not fit under Section 27"); *Roskind*, 165 F. Supp. 2d at 1066 ("the Exchange Act leaves violations of NASD rules to be addressed by NASD and where possible by nonconflicting state law. Accordingly, the Court finds that § 78aa does not deprive a state court of jurisdiction to adjudicate state law claims against a securities dealer").

This case is distinguishable from cases where an SRO (like FINRA) is sued under state law. *See, e.g., D'Alessio v. N.Y. Stock Exch.*, 258 F.3d 93, 103 (2d Cir. 2001); *Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers*, 159 F.3d 1209, 1212 (9th Cir. 1998); *Hawkins v. Nat'l Assoc. Sec. Dealers, Inc.*, 149 F.3d 330, 332 (5th Cir. 1998). The claims in these cases were subject to the exclusive jurisdiction of the Exchange Act because they "sought relief based upon violation of exchange rules," *Sparta*, 159 F.3d at 1211, and "require[d] a court to construe federal securities laws and evaluate the scope of the NYSE's duties, as defined under the Exchange Act and the regulations thereto, in enforcing and monitoring a member's compliance with those laws." *D'Alessio*, 258 F.3d at 101-02; *see also Hawkins*, 149 F.3d at 331 ("All of Hawkins's allegations against the NASD may be categorized as an attempt to 'enforce any liability or duty' created by relevant federal securities laws and regulations").

By contrast, defendants in this case are securities dealers who are members of FINRA. This was the relevant distinction in *Roskind*, because "[a]lthough the Exchange Act expressly

-17-

requires that a self-regulatory organization comply with its own rules and that dealers comply with the Exchange Act, *it does not expressly require NASD members to comply with NASD rules nor does it recognize a right of action against a dealer for NASD violations.*" 165 F. Supp. 2d at 1066 (emphasis added). Similarly, in *Lippitt*, the defendant was a brokerage firm, not an SRO. Therefore, the court in *Lippitt* concluded that the Exchange Act did not provide "'the exclusive cause of action' for false advertising and deceptive marking claims against securities firms selling callable CDs." 340 F.3d at 1042. In light of the fact that the Exchange Act does not impose a liability or duty on the defendants by virtue of the FINRA rules, plaintiffs' claims do not fall within the exclusive jurisdiction of the Exchange Act. *See, e.g., Ford v. Hamilton, Inc.*, 29 F.3d 255, 259 (6th Cir. 1994) (claim against securities firm not within exclusive jurisdiction of § 78aa because neither party sought to "enforce any liability or duty created by [federal securities laws] or by the rules and regulations adopted thereunder").

Defendants invoke the artful pleading doctrine, an exception to the well-pleaded complaint rule which "allows courts to look beyond a plaintiff's characterization of a claim to determine whether a claim truly arises under federal law." *Collins v. Ralston Purina Co.*, 147 F.3d 592, 602 n.1 (7th Cir. 1998). However, without "complete preemption, the artful pleading doctrine does not apply." *Terrebonne Homecare, Inc. v. SMA Health Plan, Inc.*, 271 F.3d 186, 189 (5th Cir. 2001) (citing *Rivet v. Regions Bank of Louisiana*, 522 U.S. 470, 475-76 (1998)). The Exchange Act "contains a specific provision stating that it is intended to complement, rather than override, state securities laws." *State of New York v. Justin*, 237

-18-

F. Supp. 2d 368, 375 (W.D.N.Y. 2002) (citing 15 U.S.C. § 78bb(a)). Accordingly, "federal securities law does not dominate the field so as to invoke the complete preemption 'exception' to the well-pleaded complaint rule." *Id.*; *see also Lippitt*, 340 F.3d at 1037 ("the Exchange Act does not completely preempt or occupy the field of securities regulation").

In reality, complete preemption is a "federal jurisdiction doctrine" which permits "recharacterization of a plaintiff's state law claim as a federal claim so that removal is proper." *Moran v. Rush Prudential HMO, Inc.*, 230 F.3d 959, 967 (7th Cir. 2000) (quoting *Lister v. Stark*, 890 F.2d 941, 943 n.1 (7th Cir. 1989)). The logical implication is that "complete preemption would not be appropriate if a federal remedy did not exist in the alternative. Otherwise, a plaintiff would be forced into federal court with no relief available for . . . vindicating the same interest. . . . Preemption is what wipes out state law, *but the foundation for removal is the creation of federal law to replace state law*." *Rogers v. Tyson Foods, Inc.*, 308 F.3d 785, 788 (7th Cir. 2002) (emphasis added). Congress' determination that there should be no private federal right of action against brokers who violate regulations promulgated under the Exchange Act further demonstrates that the state law claim is not subject to complete preemption. *See, e.g., Fuller v. BNSF Railway Co.*, 472 F. Supp. 2d 1088, 1093 (S.D. Ill. 2007) ("Because the FRSA affords Plaintiffs no federal remedy, this case is not removable to federal court pursuant to the complete preemption doctrine").

**B.    Substantial federal question**

Defendants also attempt to assert jurisdiction under the "substantial federal question" doctrine. Where state law creates the plaintiff's cause of action, there is no federal question

jurisdiction unless "some substantial, disputed question of federal law is a necessary element . . . of the well-pleaded state claim . . ." *Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 13 (1987). Stated another way, a state law cause of action is removable only where it "raises a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable & Sons Metal Products, Inc. v. Darue Engineering and Manufacturing*, 545 U.S. 308, 312 (2005). The category of cases removable under the substantial federal question doctrine are considered "special," "small," and "slim." *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 699-701 (2006).

Plaintiffs' third-party beneficiary claim is predicated upon the alleged violation of various FINRA rules, regulations and customs. While these rules are enacted pursuant to the Exchange Act, they are *not* enacted directly by Congress or the SEC. FINRA is a private organization. Therefore, it is inaccurate to assume that the interpretation of these rules presents a substantial federal issue in the first instance. Reliance upon a violation of those rules to establish liability under state law does not provide a right to removal. *See, e.g., Ford*, 29 F.3d at 259 ("A breach of the NASD rules does not present a question that arises under the laws of the United States within the meaning of 28 U.S.C. § 1331, and it follows *a fortiori* that compliance with NASD rules does not give rise to federal question jurisdiction"); *Roskind*, 165 F. Supp. 2d at 1067 ("Even if Plaintiff relies on the NASD

-20-

violation to show Defendant's actions were 'unlawful,' such reliance does not entitle Defendant to remove").

However, even if plaintiffs' third-party beneficiary claim presents a "contested and substantial federal question, the exercise of federal jurisdiction is subject to a possible veto." *Grable* at 313. In *Grable*, the Supreme Court asserted jurisdiction over a state quiet title action which rested on the meaning of a federal tax provision. Jurisdiction was proper, in part, because "it is the rare state quiet title action that involves contested issues of federal law. . . . Consequently, jurisdiction over actions like Grable's would not materially affect, or threaten to affect, the normal currents of litigation." *Id.* at 319. *Grable* represents a very narrow category of cases. For instance, in *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804, 817 (1986), the Supreme Court refused to invoke federal question jurisdiction in a case involving a state law tort claim which rested in part on the allegation that a drug company violated a federal misbranding prohibition. If the "federal labeling standard without a federal cause of action could get a state claim into federal court, so could any other federal standard without a federal cause of action. And that would have meant a tremendous number of cases." *Grable* at 318. The same rationale is relevant here. Defendants' characterization of plaintiffs' claim as "unusual" may or may not be accurate, but with the increasing dissatisfaction of private investors, claims such as this one are likely to proliferate.

IV. **Costs**

28 U.S.C. § 1447(c) allows the Court to "require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." Attorney fees may

-21-

be awarded under § 1447(c) only when the removing party "lacked an objectively reasonable basis for seeking removal." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005). The law concerning domicile requires the weighing of multiple factors, none of which are outcome-determinative. Zemlyak's previously established domicile in Missouri, along with the fact that Zemlyak works in St. Louis, gave the defendants an objectively reasonable basis for seeking removal.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

1.      Plaintiffs' motion for remand [D. 13] is **GRANTED**;

2.      Plaintiffs' motion for costs and fees [D. 13] is **DENIED**; and

3.      The Clerk of Court is directed to **REMAND** this matter to Milwaukee County Circuit Court.

Dated at Milwaukee, Wisconsin, this 10th day of April, 2009.

**SO ORDERED,**

*s/ Rudolph T. Randa*
**HON. RUDOLPH T. RANDA**
**Chief Judge**

-22-